ARTHUR L. ANDREWS

*v.*

THE GUAYAQUIL AND QUITO RAILROAD COMPANY et al.

[Decided September 16th, 1907.]

Upon the question whether certain moneys lent to a corporation called the Ecuador Company by P., one of its stockholders, and not paid to it by him on account of his stock subscription, as already found by this court, were secured to be repaid to him by the pledge of certain shares of the preferred stock of a railroad company called the Guayaquil and Quito Railroad Company, which were subject to the exercise of the power contained in a trust instrument executed to trustees by the Ecuadorian Association, Ltd., to which preferred stock the complainant claims title under an assignment from P., evidence examined, and *held* (1) that the pledge was incomplete and that whatever right P. or his assignee, the complainant, may have to such preferred stock, rests on a promise to transfer and not on an actual transfer of such stock, and that such promise being for a by-gone consideration and not for a present or future consideration, will not be enforced in equity, inasmuch as equity only compels the performance of contracts based on valuable consideration, and the rule is that a by-gone consideration cannot be made a good consideration for a promise; and further *held* (2) that if such preferred stock were pledged to P., such pledge was not authorized by the power contained in said trust instrument.

On final hearing on pleadings and proofs.

*Messrs. McCarter & English* and *Mr. Charles A. Collin* (of New York), for the complainant.

*Mr. Charles L. Corbin,* for the receiver, Black.

*Mr. Van Buskirk,* for the trustees.

STEVENS, V. C.

The circumstances under which money was obtained for the building of the Guayaquil and Quito railroad in the later stages

of its construction were fully stated in my opinion in the case of *Ecuadorian Association* v. *Ecuador Company,* reported in *70 N. J. Eq. (4 Robb.) 277,* and on appeal in *71 N. J. Eq. (1 Buch.) 757.* I shall not repeat here what I said there.

The question then considered was whether Robert C. Pruyn had become a stockholder of the Ecuador Company and was liable to · assessment as such. My conclusion was that although he had formally agreed to take stock, his agreement was to take it, not for money, but in exchange for stock of another company called the Ecuadorian Association, and that the receiver was therefore put to his election either to perform the agreement according to its terms or to repudiate it, *in toto,* on the ground that the Ecuadorian stock was not a fair equivalent. I used the term "binding contract" as applicable to the transaction between Pruyn and the Ecuador Company. The use of the word "binding" was unhappy and was properly criticised by the court of errors and appeals. It did not, in fact, express my meaning, which was merely "contract complete in point of form."

The question that I now have to consider is whether the sum of $65,750.69 lent, as I found, by Mr. Pruyn to the Ecuador Company between February 1st, 1903, and June 13th, 1903, and not as the receiver contended paid on account of his stock subscription is secured by preferred stock of the Guayaquil and Quito Railroad Company to the nominal amount of $650,000. Pruyn's contention is that this stock was pledged, and the receiver's contention, as well as the contention of the trustees under the deed of January 31st, 1902, is, *first,* that the pledge, if any, was incomplete, and that equity would not lend its aid to complete and enforce it, because not founded on a valuable consideration, and *second,* that it was not warranted by the trust instrument. Another contention of the receiver which I regard as untenable is that the stock belonged to the Ecuador Company, a fact not proved, and that the pledge was made under its direction, at a time when that company was insolvent and unable to give a preference.

In discussing the two first contentions, it is important to get at the real situation, which is no doubt a complicated one. · I shall state it as briefly as I can. The Ecuadorian Association,

a Scotch company, had agreed to construct the Guayaquil and Quito railroad. It had, for the purpose of getting the necessary working capital, issued certificates entitling the certificate holders to debentures. The ready money obtained in this way proved inadequate. The association was receiving in payment for the work of construction bonds and stocks of the railway company. These when received from time to time as the work progressed were selling at a heavy discount, and did not realize enough for the association's purposes. To provide further funds a deed was executed by it to three trustees, Mr. Garduyne, Mr. De Friese, of England, and Mr. Lockwood, of New York, by the terms of which those entitled to debentures of the association were to receive in lieu thereof bonds of the railway. They were to receive besides a new certificate, valuable only on a certain contingency. In consideration of this, the debenture holders were to give up all their right to the remaining bonds, received or to be received, and to all the stock of the railway company, preferred and unpreferred. The association was then itself to issue stock, and the bonds and stock of the railway company thus released were to enure to the benefit of the association stockholders. The trustees were vested with large discretionary powers, and, among others, the power to raise money by the sale or pledge of the free bonds and stock transferred or to be transferred to them.

The clause in the trust deed on which the present controversy turns, so far as it is pertinent, is as follows:

"The trustees shall, in the first place, from time to time and at any time or times, dispose of or otherwise deal with the mortgaged premises (*i. e.*, the securities transferred), or any part or parts thereof  *  *  * in any way or ways which may be required by the association and approved by the trustees *for the purpose of raising money in order to enable the association to perform its obligations under the construction contract* and without prejudice to the generality of the preceding provisions of this sub-clause, the trustees may, *for such purpose as last aforesaid,* approve of any pledges, mortgages, sales or public or private issues of the mortgaged premises, or any of them, upon and subject to any terms and conditions whatever. The trustees shall have power, in their absolute and uncontrollable discretion, to settle and finally decide with the consent of the association what operations are authorized by this sub-clause and which of the mortgaged premises shall, from time to time, be applied for the purpose of such operation."

I shall consider, *first,* whether the preferred stock was validly pledged to Mr. Pruyn; *second,* whether; if pledged, the pledge was authorized by the power.

*First.* Was it pledged? It is not denied that Mr. Pruyn lent $65,750.69 to the Ecuador Company and that he afterwards negotiated for the security in question. While it is conceded that he took some steps toward getting it, it is denied that the pledge was perfected. What was done was this: Mr. Pruyn had lent most of the above sum by March 30th, 1903. On that day the directors of the Ecuador Company passed a resolution directing and empowering its officers to communicate with the trustees in London and to take whatever steps were

"necessary to empower and direct the said trustees to deliver to Robert C. Pruyn as collateral in lieu of the thirty-two railway bonds aforesaid, Guayaquil and Quito preferred stock to an amount equal to ten times the amount so advanced in cash by said Pruyn," &c.

On April 3d Mr. Adams, the president of the company, sent to the trustees in London a copy of this resolution. Mr. Lockwood, a director, also cabled in reference to the transfer. On April 29th Mr. Garduyne, one of the trustees, replied to Mr. Adams, as follows:

"In compliance with your request and Mr. Lockwood's cable advices we have this day instructed Messrs. Glyn, Mills, Currie & Company to hold $650,000 of the preferred stock of the Guayaquil and Quito railway to the order of Mr. Robert C. Pruyn."

The fact was, however, that Glyn, Mills, Currie & Company, the bankers of the trustees, were nothing but the bare custodians of a single certificate of stock for a much larger amount than $650,000. This certificate stood in the name of the trustees and was never surrendered for division and reissue. No legal assignment was ever made to either Pruyn himself or to anyone for him. And no manual transfer of the larger certificate was ever made to Pruyn or to anyone who represented him.

It is true that the trustees did instruct Glyn, Mills, Currie & Company to hold $650,000 of stock for Pruyn, and it would seem that in consequence of this instruction these bankers did

make some sort of a note upon their books, but the complainant has not put this note in evidence and we do not know what it was. It does not appear that the bankers even went so far as to notify Pruyn of their instructions or of what they had done in consequence. No relationship whatever was created by writing or otherwise, as far as appears between Pruyn and the bankers, and I take it that the bankers were at the beginning and continued to be the agents of the trustees only.

It is true that in a letter written for the bankers by one Harvey to the complainant, Andrews, to whom Pruyn afterwards made a formal assignment and who had demanded its transfer to himself, it is said "the preferred stock of the Guayaquil and Quito Railway Company in question stands in the name of Mr. R. C. Pruyn, and we can act upon his orders only with reference to it," but this was a manifest mistake on Harvey's part and was corrected in the subsequent correspondence.

The transaction then remained *in fieri*. Enough appears to justify the inference of a promise to transfer the stock, but it cannot be denied that the stock was not transferred. The certificate for a much larger number of shares stood, and still stands, in the name of the trustees and in the custody of their agent. Whatever right Pruyn or his assignee, Andrews (who stands in Pruyn's shoes) may have must rest on promise and not on performance.

The question, then, is, was this promise based on valuable consideration? The cash book of the Ecuador Company shows that the first advance by Pruyn was made on February 1st, 1903, and the last, but one, on April 28th, 1903. Garduyne's letter was written from London on April 29th, and, of course, did not reach New York for several days. I leave out of view the insignificant sum of $145, which appears to have been advanced by Pruyn to the Ecuador Company on June 13th, and to have been at once paid the "R. & R. certificate books," whatever that entry may mean. There is nothing to show that it went to any object connected with the trust, and even if it had been advanced on the strength of the promise, as to which there is no evidence, it would not in anywise affect the question whether the stock was to stand as security for the money ad-

vanced prior to April 29th. It appears, therefore, that the consideration for the promise was a by-gone consideration, and not a present or future consideration. Can such a promise be enforced in equity? Equity only compels the performance of contracts based on valuable consideration. Is a by-gone consideration a valuable consideration? The rule is (*1 Add. Cont.* 7), that a by-gone consideration cannot be made a good consideration for a promise. That this is the rule in this state is shown by the decision of the court of errors and appeals in *Trust Company* v. *Trustees of William M. Fisher Co., 67 N. J. Eq. (1 Robb.)* 604. Justice Dixon there said: "The general rule is that one who acquires property (outside of commercial paper) as mere security for antecedent debts is not a holder for value," (and see *Pom. Eq. Jur.* § 1405). In the leading case of *Ellison* v. *Ellison, 6 Ves. 656,* Lord Eldon put the very case now in controversy. He says: "I take the distinction to be that if you want the assistance of the court to constitute you a certain *cestui que trust,* and the instrument is voluntary, you shall not have that assistance for the purpose of constituting you a *cestui que trust;* as upon a covenant to transfer stock, if it rests in covenant and is purely voluntary, the court will not execute that voluntary covenant; but if the party has completely transferred the stock, though it is voluntary, yet the legal conveyance being effectually made, the equitable interest will be enforced in this court."

It is quite plain, then, that the letter written by Garduyne to Adams on April 29th does not give the complainant a right to relief, and if I may judge from the printed argument furnished me, it is this letter, taken in connection with the correspondence referred to, that the complainant now principally relies upon.

In his bill, however, he based his case upon a written agreement, dated May 6th, 1903, and ratified and approved by the London trustees on June 29th, 1903. I think this agreement cannot be enforced for two reasons.

*First.* Pruyn has not performed the agreement on his part. Andrews, his assignee, does not even, either in his bill or in any

other way, offer to perform it. On the contrary, he charges that Pruyn did· perform by paying the money. But the evidence does not. support the allegation. Pruyn himself does not testify. The cash book of the Ecuador Company does not show any advance by Pruyn to it after April 28th, except the item of June 13th, $145, to which I have already referred. In the bill of particulars appended to Andrews' suit in the supreme court of this state—a suit against the Ecuador Company only— which that company allowed to go by default, there is mention of· a note, dated May 1st,· 1903, for $544.50. But the item does not appear in the cash account of the Ecuador Company, and Pruyn in his letter of May 22d, 1903, says it represents interest·on prior loans.

I think it appears, beyond all question, that Pruyn did not pay the $3,100, and so did not perform the agreement on his part. The agreement to pay this money constituted the sole consideration for the promise to give the security. The complainant is not in a position to ask performance by the trustees.

It is contended, on behalf of the trustees, that Lockwood was induced to enter into the agreement by the fraudulent misrepresentation made to him by Pruyn, that Pruyn had neither signed nor authorized the agreement of February 24th, 1903. Lockwood's evidence is not contradicted by Pruyn, but, notwithstanding, it is apparent that if Lockwood was deceived, as he says he was, the London trustees were not. They knew the fact, and by the terms of the instrument their signatures alone were sufficient to bind the trust from· the time they signed, if their agreement was warranted.

Was the agreement warranted? Was it authorized by the terms of the trust deed? Pruyn, of course, knew of this instrument. It is referred to· in the agreement itself. By the clause already quoted the trustees are authorized to dispose of or otherwise deal with the securities in their hands

"in any way or ways which may be required by the (Ecuadorian) Association and approved by· the trustees for the purpose of raising money in order to enable the association to perform its obligations under the construction contract."

The question, then, is, whether an agreement to pledge shares to secure prior advances to the Ecuador Company in consideration of a small further advance of money to *it,* and not to the Ecuadorian Association, whose trustees they were, was within their powers. To answer this question understandingly it will be necessary to take a general view of the then situation.

The trustees were the trustees of the Ecuadorian Association. The trust deed antedated the formation of the Ecuador Company by a year. But the end for which that deed was intended, viz., the raising of sufficient money to complete the railway, had not been completely attained. More capital was needed, and this was to be secured by an arrangement which, speaking generally, was to make Pruyn and his associates half owners of the future profits of construction on his undertaking, to contribute a very large sum of money. The plan was to form the Ecuador Company and to issue half of its stock to the certificate holders of the Ecuadorian Association, and half to Pruyn. This plan was embodied in the agreements referred to in my former opinion. It was consented to by the certificate holders of the Ecuadorian Association, as well as by the association itself and its trustees. It contemplated a complete transfer of all the assets and of all the shares of the association to the Ecuador Company, which was to issue to the Ecuadorian shareholders its own stock. The trustees were justified in assenting, for the reason that they had the consent of their *cestui que trust.* But in point of fact the enterprise came to a sudden halt when, in April, 1903, Pruyn returned to this country. He seems to have been advised that his unconditional acceptance of the plan in its entirety, as it had been formulated in London, was dangerous. And after May 1st. he did nothing to carry it into effect. The evidence certainly suggests, if it does not prove, that the agreement of May 6th, on which Andrews now sues, was a device for giving to him better security for his advances to the Ecuador Company than he possessed. At all events, it is certain that, although he had agreed to the scheme, he did nothing to carry it into execution after the date named and the Ecuador Company, which was little more than Pruyn's *alter ego,* was in

consequence stranded.   While the agreement by which he was
to get security is dated May 6th, it did not receive the assent
of the London trustees until June 29th.   Then only did it
acquire vitality, if it has any.   But on May 22d, 1903, we
find Pruyn .writing to Garduyne and notifying him that under
the terms of the agreement. of May 6th, he had demanded
payment of the notes of the Ecuador Company to the amount
of $65,101.19, and he followed up this demand by bringing
suit in the supreme court on the 9th of July following.

Now, the legal situation of the parties in June, 1903, was
this:   The Ecuadorian Association and its shareholders and
their trustees had, as I have said, assented to an agreement of
transfer of both the property of the association and of the
shares representing that property to the New Jersey Company,
theretofore organized and financed by Pruyn, in accordance
with the plan formulated and reduced to writing in London.
Pruyn had repudiated the plan and had, by formal demand,
preparatory to suit, required payment of · a ·sum which he knew
the company could not pay.   The accomplishment of this plan
thus became a practicable impossibility.   The trustees, had
it been completely carried out, would have become the trus-
tees of the Ecuador Company and its stockholders in just the
same way that they were the trustees of the Ecuadorian As-
sociation and its shareholders; but the plan being repu-
diated, although the Ecuadorian Association had made a for-
mal transfer of whatever it possessed, yet the shareholders,
not having transferred their certificates and being under no
legal compulsion to do so in view of Pruyn's attitude, I think
it is very clear that the trustees remained in the consideration
of a court of equity, trustees for the Ecuadorian shareholders.
This being so, it was their duty to conserve their interests and
not those . of Pruyn.   It seems to me that they could not, on
June 29th, have properly agreed to transfer any of the prop-
erty of the Ecuadorian Association to secure a by-gone in-
debtedness, an indebtedness which they were neither in law
nor (considering Pruyn's attitude) *in foro conscienti* bound
to secure.   The transfer, if made, would not have had for its
purpose · the raising of money in order to enable the Ecuadorian

Association to perform its obligation under the construction contract. This being so, it seems to me that the complainant is not in a position to ask that a court of equity compel the trustees to make an assignment of the stock. For this reason, also, relief should be denied.